*Velarde v. GW GJ, Inc., et al.*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

August Term, 2017

(Argued:  March 8, 2018     Decided:  February 5, 2019)

Docket No. 17-330

PATRICK VELARDE, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiff-Appellant*,

–v.–

GW GJ, INC. D/B/A THE SALON PROFESSIONAL ACADEMY OF BUFFALO, MARGARET GRENAUER, AND PAUL GRENAUER,

*Defendants-Appellees.*

B e f o r e :

CABRANES AND CARNEY, *Circuit Judges*, and CAPRONI, *District Judge.**

Plaintiff-appellant Patrick Velarde sued The Salon Professional Academy of Buffalo and its owners, Margaret Grenauer and Paul Grenauer, (collectively, "the Academy") in the United States District Court for the Western District of New York

---

* Judge Valerie E. Caproni, of the United States District Court for the Southern District of New York, sitting by designation.

(Skretny, *J.*) for alleged violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and Articles 6 and 19 of the New York labor law, N.Y. Lab. Law §§ 190, 650 *et seq.* Velarde alleges that, as a part of his vocational training at the Academy for becoming a licensed beautician, he was required to perform cosmetology services without compensation in the Academy's student salon. He argues that the requirement violated FLSA and New York labor law. The District Court granted judgment on the pleadings to the Academy, reasoning under the test that we established in *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 536-537 (2d Cir. 2015), that Velarde was the "primary beneficiary" of his relationship with the Academy and therefore not an "employee" of the Academy for the purposes of both FLSA and New York labor law. On de novo review, we agree with the District Court's analysis and AFFIRM its award of judgment to the Academy.

AFFIRMED.

————————

ROBERT WISNIEWSKI, ESQ., New York, NY, *for Plaintiff-Appellant*.

JAMES W. GRABLE, JR. (Terrence M. Connors *on the brief*), Connors LLP, Buffalo, NY, *for Defendants-Appellants*.

————————

SUSAN L. CARNEY, *Circuit Judge*:

In *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2015), we addressed the application of certain federal and state employment laws to activities performed in a commercial setting by temporary "interns." We applied a "primary beneficiary" test: if, under certain enumerated circumstances, the intern is the "primary beneficiary" of the relationship, then the host entity is not the intern's employer and has no legal obligation to pay compensation under those laws; if, on the other hand, the host entity is the "primary beneficiary" of the relationship, then the entity is an employer and federal and state employment laws—in particular, the Fair Labor Standards Employment Act,

29 U.S.C. §§ 201 *et seq.* ("FLSA"), and Articles 6 and 19 of the New York Labor Law §§ 190, 650 *et seq.* ("NYLL")—impose compensation obligations.

In the case at bar, we consider the applicability of this test to individuals enrolled in a for-profit vocational academy who are preparing to take a state licensure examination and who must first fulfill state minimum training requirements. These individuals fulfill those requirements by working under Academy supervision for a defined number of hours, without pay. We determine that the *Glatt* test governs in the for-profit vocational training context, and we further conclude that here, the plaintiff, former student of the Academy was the primary beneficiary of the relationship, thus excusing the latter from potential compensation obligations under FLSA or NYLL related to plaintiff's limited work there as a trainee.

## BACKGROUND[1]

On April 18, 2011, desiring to become a cosmetologist in New York state,[2] Patrick Velarde enrolled in the Academy, a for-profit cosmetology training school operated by

---

[1] We review de novo a district court's decision under Federal Rule of Civil Procedure 12(c) to grant a defendant's motion for judgment on the pleadings. In doing so, we accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). In addition to the facts alleged in the complaint, we consider the defendants' answer, any written documents attached to the complaint or the answer, any document that is incorporated by reference into the complaint, any document that is "integral" to the complaint, and any matter of which the court may take judicial notice. *Id*. at 422. We have identified no material conflicts in the parties' accounts. Although the parties do dispute whether, when enrolling, Velarde was aware that he would have to work in the Salon without pay to graduate, *see* Am. Compl. ¶ 46, App'x 17, Velarde undisputedly knew that the program included a practical component, and so we consider the dispute immaterial to our resolution of the appeal.

[2] The New York State Division of Licensing Services advises that "cosmetology" means:

3

the individual defendants and located in the City of Tonawanda, in Erie County, New York. On November 16 of that year, he finished the Academy's program, having successfully completed what the Academy's diploma describes as a "1000 hour course of study in [c]osmetology [a]pproved by the state of New York." App'x 96. The Academy's course included both classroom instruction and supervised practical experience in its student salon (the "Salon"), in which members of the public could receive cosmetology services and the Academy's students could practice and refine their skills. Velarde provided such services, under supervision, as generally described by his enrollment agreement and course catalogue.

Having become a licensed cosmetologist in 2012, Velarde sued the Academy for unpaid wages in 2014—three years after completing the program. He alleged that the Academy violated FLSA and several sections of NYLL by failing to pay him for the work that he did in the Salon while he was enrolled at the Academy. In his operative complaint,[3] he charged that, "under the terms of the students' enrollment agreement," he and all students enrolled in the Academy were unlawfully required to work without

---

> providing services to the hair, head, face, neck or scalp of a human being, including but not limited to shaving, trimming, and cutting the hair or beard either by hand or mechanical appliances and the application of antiseptics, powders, oils, clays, lotions or applying tonics to the hair, head, or scalp, and in addition includes providing, for a fee or any consideration or exchange, whether direct or indirect, services for the application of dyes, reactive chemicals, or other preparations to alter the color or to straighten, curl, or alter the structure of the hair of a human being.

https://www.dos.ny.gov/licensing/cosmetology/cosmetology.html (last visited Jan. 9, 2019); *see also* N.Y. Gen. Bus. Law § 400(7).

[3] Velarde filed his original complaint on August 22, 2014, and filed an amended complaint on August 26, 2014. References to the "complaint" in this opinion are to the amended complaint.

4

pay in the Salon as part of their course of instruction. Am. Compl. ¶ 4, App'x 8; Enrollment Agt., App'x 98. After finishing eight weeks in the classroom, Velarde worked at the Salon, logging 34 unpaid hours per week for 22 weeks and practicing under the supervision of licensed practitioners. During those 22 weeks, he performed "barbering and hair styling, skin and body treatments, [and] manicure and pedicure services," for the public. Am. Compl. ¶¶ 4, 19, App'x at 8, 11. He and other Academy students were also obligated to perform janitorial and clerical work at the Salon. Students in the Salon segment of the vocational program were further required, he complains, to provide "whatever cosmetological service was demanded by a customer": they could not "choose what services they wanted or needed additional training in." Am. Compl. ¶ 37(c), App'x at 15. Velarde sought relief both on his own behalf and on behalf of other former and present students.

For Salon services, the Academy charges clients "discounted prices," with prices "vary[ing] according to student [skill] level." Am. Compl. ¶¶ 25-26, App'x 12. The Salon's rates are lower than those of nearby salons employing only cosmetologists who are already licensed. The Academy—which is, as mentioned, a for-profit enterprise—derives some of its revenues from the fees paid by the Salon's clients. Velarde would receive tips for his work, but any gratuities were nominal in amount. The Academy also derives revenue directly from students, of course: over the course of his thirty-week course of study, Velarde paid the Academy $12,823 for "tuition, books, kits, and other fees." Am. Compl. ¶ 18, App'x 10.

To offer commercial cosmetology services in New York, an individual must obtain and maintain a State cosmetology license. N.Y. Comp. Codes R. & Regs. tit. 19, § 160.2. New York requires license applicants to have completed 1,000 hours of

5

coursework in defined subject areas, including safety and health, hair styling, and nail care. *Id.* § 162.4. Aspiring cosmetologists must also pass the state's licensure examination, which has both written and practical components. N.Y. Gen. Bus. Law §§ 406(2)(b), 407(1).

In his suit, Velarde sought unpaid hourly minimum wages including tips and overtime for his work in the Salon. He contended that, for purposes of FLSA and NYLL, he and other Academy students were employees of the Academy while they performed services in the Salon.[4] In 2016, after the Academy filed its Answer, the assigned Magistrate Judge (Schroeder, Jr., *M.J.*) filed a report and recommendation concluding that the Academy's motion for judgment on the pleadings should be granted. In a 2017 text order, the District Court rejected Velarde's objections, accepted the Magistrate Judge's report and recommendation, and entered judgment for the Academy.

This appeal followed.

## DISCUSSION

We review *de novo* a district court's decision awarding judgment on the pleadings. *Mantena v. Johnson*, 809 F.3d 721, 727 (2d Cir. 2015).

The federal Fair Labor Standards Act requires, among other things, that employers pay "[e]mployees engaged in commerce" an hourly minimum wage. 29 U.S.C. § 206(a). Similarly, the New York Labor Law requires state employers to pay

---

[4] Velarde also pursued a claim for quantum meruit against the Academy in the district court proceedings. The District Court dismissed that claim. On appeal, Velarde has withdrawn his challenge to the dismissal, and we therefore treat the challenge as waived.

their "employees" a set minimum wage.[5] N.Y. Lab. Law § 652. As described above, Velarde's action calls for us to decide whether students at a for-profit vocational school completing state-mandated training hours in preparation for (and to qualify for) a state licensure exam are correctly treated as "employees" of their respective schools with respect to the "work" that they do as they are training.

We have observed elsewhere that FLSA and NYLL define "employee" in "nearly identical terms." *Glatt*, 811 F.3d at 534. Accordingly, "we construe the NYLL definition as the same in substance as the definition in the FLSA."[6] *Id.* FLSA's definition of "employee," however, is far from a model of clarity: it offers the unenlightening tautology that an "employee" is an "individual employed by an employer." 29 U.S.C. § 203(e)(1). FLSA advises further that to "employ" means "to suffer or permit to work." *Id.* § 203(g).

On de novo review, we first conclude that the District Court was correct to analyze whether Velarde was an "employee" of the Academy by using the "primary beneficiary" test established in *Glatt*. Applying that test, we then determine that Velarde was not an employee of the Academy when enrolled there and working in the Salon, because he was the primary beneficiary of his relationship with the Academy, including with respect to his work in the Salon.

---

[5] NYLL sets its minimum hourly wage at an amount higher than FLSA's floor. *See* N.Y. Lab. Law § 652.

[6] The parties do not dispute that our resolution of Velarde's FLSA claim is dispositive of his NYLL claim.

## I.      Primary beneficiary test

In *Glatt*, we considered the employment status of unpaid interns who "were enrolled in or had recently completed a formal course of post-secondary education" and who were working temporarily in a commercial concern. 811 F.3d at 537. As we observed there and have observed in the past, the concept of "employment"—pivotal to FLSA's application—is "a flexible [one] to be determined on a case-by-case basis by review of the totality of the circumstances" while emphasizing the "economic reality" of the parties' relationships. *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008); *see also Glatt*, 811 F.3d at 536.

We looked for guidance to the Supreme Court's decision in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947). There, the Supreme Court instructed that FLSA, enacted in 1938, "covers trainees, beginners, apprentices, or learners *if they are employed to work for an employer for compensation.*" *Id.* at 151 (emphasis added). The Court cautioned, however, that "a person whose work serves only his own interest" does not necessarily become "an employee of another person who gives him aid and instruction." *Id.* at 152.

The *Portland Terminal* decision addressed whether unpaid "trainees" in a railroad's program for prospective brakemen were employees for FLSA minimum wage purposes. 330 U.S. at 149–50. The "course of practical training" that constituted the railroad's program had the following features:

> If accepted for the training course, an applicant is [assigned] to a yard crew for instruction. Under this supervision, he first learns the routine activities by observation, and is then gradually permitted to do actual work under close scrutiny. His activities do not displace any of the regular employees,

8

> who do most of the work themselves and must stand immediately by to supervise whatever the trainees do. The applicant's work does not expedite the company business, but may, and sometimes does, actually impede and retard it.

*Id*. An applicant who successfully completed the weeklong training course would be added to the list of potential hires "from which the company can draw when their services are needed." *Id*. at 150. The Court commented that, "[h]ad these trainees taken courses in railroading in a public or private vocational school, wholly disassociated from the railroad, it could not reasonably be suggested that they were employees of the school." *Id*. at 152–53. Reasoning that FLSA "was not intended to penalize railroads for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees," *id*. at 153, the Court concluded that the trainees were not railroad employees.

Distilling the import of *Portland Terminal* in the context of interns temporarily performing work in a commercial enterprise, we held in *Glatt* that "the proper question [with respect to a purported 'employment' relationship] is whether the intern or the employer is the primary beneficiary of the relationship." *Glatt*, 811 F.3d at 536. We highlighted several salient features of the "primary beneficiary" test: under it, we consider "what the intern receives in exchange for his work"; we "accord[] courts the flexibility to examine the economic reality as it exists between the intern and the employer"; and we acknowledge the complexities of relationships involving "the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment." *Id*.

Velarde argues that the District Court erred in applying *Glatt*'s primary beneficiary test in his situation because he was not an "intern"; in his view, the District

Court should have focused solely on what he identifies as the economic reality of his relationship with the Academy. Velarde contends that one need ask only whether the putative employer received an "immediate advantage" from a putative employee's work to define the "economic reality" of this relationship. From this, he argues that the Academy must have been his "employer" because it derived revenue by providing Velarde's services to the public; any training that Velarde received and the skills that he developed by virtue of his supervised work experiences in the Salon are, in Velarde's view, besides the point.

As Velarde points out, it is true that in *Portland Terminal* the Supreme Court counted as one factor relevant to its holding that the railroad received no "immediate advantage" from the trainees' work. *Portland Terminal*, 330 U.S. at 153. As we explained in *Glatt*, however, *Portland Terminal* does not imply that FLSA renders any organization that receives some immediate benefit from unpaid labor an "employer" of the individual from which the benefit is derived. *See Glatt*, 811 F.3d at 535–36 (rejecting "immediate advantage" test in favor of "primary beneficiary" analysis). We agree with Velarde that the benefits gained by the Academy from his time in the Salon are relevant to determining whether it "employed" Velarde for FLSA purposes, but those benefits are only one factor among several that properly bear on our analysis.

In *Glatt* and in subsequent decisions, we have described the primary beneficiary test as a "way to distinguish employees from bona fide interns." *Xuedan Wang v. Hearst Corp.*, 877 F.3d 69, 72 (2d Cir. 2017). We conclude here that the test is equally suitable for distinguishing between "employees" and "bona fide students" of vocational schools or vocation-related programs (such as a training salon) where trainees acquire necessary skills by practicing their craft in a real-world setting. Like interns, vocational students

10

enter a course of study with "the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment." *Glatt*, 811 F.3d at 536. The primary beneficiary test allows courts to measure the extent to which the school meets these expectations against the economic benefits received by the school in the form of free labor. As with interns, disentangling the threads of a complex economic fabric and teasing out the respective benefits garnered by students and their commercial training programs is key to determining whether, for FLSA purposes, a trainee is serving *primarily* as an employee of that school or training program—or is *primarily* a student.

We therefore conclude that the District Court was correct to apply the primary beneficiary test in determining whether Velarde was a student or an employee of the Academy.

## II.     Velarde was the primary beneficiary of his relationship with the Academy

As set forth above, the primary beneficiary test seeks to assess the relative dominance in the relationship between host institution and the individual claiming employee status of (1) the benefits of a relationship to the individual, (2) the benefits derived from that relationship by the putative employer, and (3) the expectations of the parties. In *Glatt*, we listed several considerations that may, with others, be useful in determining which party is the "primary" beneficiary of a relationship considering the totality of the circumstances.[7] Several of the *Glatt* factors are less telling in the vocational

---

[7] In *Glatt*, we enumerated the following seven factors as relevant to the determination:

> 1. The  extent  to  which  the  intern  and  the  employer  clearly understand  that there  is  no  expectation  of  compensation.  Any

11

school context, where students would seem less likely to expect a paid position *with the school* after they graduate than an intern at a commercial enterprise for whom a professional position might be a goal. In addition, at a vocational school, the program is by definition tied to some form of an academic calendar (see factor 4, in the margin), with students receiving course credit for their work.

Others of the *Glatt* factors, however, provide insight for determining which party is the primary beneficiary of the vocational school relationship—a determination that is likely to vary in different school settings and possibly in different state regulatory

---

promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Glatt*, 811 F.3d at 536–37. We acknowledged that the list was non-exhaustive. *Id.*

12

environments. For example, a vocational school is more likely to be found to "employ" its students if it does not have a "formal education program" with "integrated coursework," and instead exclusively requires students to perform tasks that are the same as those done by regularly compensated employees. (*See Glatt* factor 3.) Similarly, a vocational school that runs a training program whose duration far exceeds "the period in which the [program] provides the [student] with beneficial learning" may well be the primary beneficiary of that relationship. (*See Glatt* factor 5.) *See also Marshall v. Baptist Hosp., Inc.*, 668 F.2d 234, 236 (6th Cir. 1981) (students are employees subject to FLSA where "the clinical training program was seriously deficient in supervision, and . . . the students continued to perform clerical chores long after the educational value of that work was over"). The state licensing requirements may often serve as strong evidence of the amount of practical training necessary for a student to become a competent professional, but will not always be determinative.[8]

We provide these examples and counter-examples not to limit future courts' consideration of some or all of the *Glatt* factors in particular circumstances, but to make plain that courts may reasonably give more weight to some considerations over others when applying the primary beneficiary test to vocational schools and their students.

Here, evaluating the totality of the circumstances presented by the parties' pleadings and keeping in mind that the goal of the primary beneficiary test is to balance flexibly the benefits received by the student and the economic realities of the student-

---

[8] *See* Meredith Kolodner & Sarah Butrymowicz, *A $21,000 Cosmetology School Debt, and a $9-an-Hour Job*, N.Y. Times, Dec. 26, 2018, at https://www.nytimes.com/2018/12/26/business/cosmetology-school-debt-iowa.html (last visited Jan. 9, 2019) (describing widely varying state requirements for the number of school hours for a cosmetology license and efforts by for-profit schools to prevent their reduction).

entity relationship, *Glatt*, 811 F.3d at 536, we have little difficulty in concluding that Velarde was the primary beneficiary of his relationship with the Academy and was not an employee of the Academy for FLSA and NYLL purposes.

Several observations are key to our reasoning.

To begin, Velarde obtained significant benefits from his work in the Academy's Salon: he was required to complete 1,000 hours of coursework in specific practical areas to qualify for taking the cosmetology license examination. *See* N.Y. Comp. Codes R. & Regs. tit. 19, § 162.4. We find it meaningful that the Academy required that Velarde complete not more than, but exactly the number of hours required by the state of New York to qualify for licensure (some of it classroom instruction, the bulk of it providing services in the Salon). Of those hours spent in the Salon, Velarde performed services under the supervision of the Academy's instructors. Velarde makes no allegation that the Academy failed in this supervision to prepare him for either the practical or written component of the licensing exam. Nor does he claim that his hands-on experience in the Salon was unrelated to his formal classroom instruction.

To rebut the inference that we draw, Velarde suggests, rather, that he should have been allowed to allocate his time differently among the various areas of study that the school required and that he should have been able to avoid performing clerical and janitorial work that he views as without instructional benefit to him. But "practical skill may entail practice, and a [student] gains familiarity with an industry by day to day professional experience" that may include relatively menial or repetitive tasks. *Wang*, 877 F.3d at 74 (concluding that interns received "beneficial learning" even when performing "repetitive or similar tasks"); *see also Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1213 (11th Cir. 2015) ("[T]he mere fact that an employer obtains a benefit

14

from providing a clinical [program] does not mean that the employer is the 'primary beneficiary' of the relationship."). That a vocational school does not provide the *optimal* learning experience for a student does not necessarily transform it into the primary beneficiary of the relationship. This is especially so where the school (as did the Academy here) provides a state-accredited course of vocational study, requires no more than the number of hours specified by the state, the state's required numbers of hours are not challenged as unreasonable, *see* n. 8, *supra*, and the school adequately prepares students for that state's licensure exam (as it did for Velarde). *See Benjamin v. B & H Educ., Inc.*, 877 F.3d 1139, 1147 (9th Cir. 2017) (students not FLSA employees where "clinical work allowed students to clock the hours they needed to sit for the state licensing exams").

Furthermore, although Velarde faults the Academy for charging customers fees for his cosmetological services that exceeded the Academy's relevant operating costs (as he calculated them), the Academy has no obligation not to turn a reasonable profit on its operations. The Academy's enrollment agreement and catalogue advised that coursework would include both classroom and practical or "salon area" components, and Velarde was aware that *he* would pay the Academy, a for-profit entity, for his participation in both components, as necessary for him to meet New York's licensure requirements.[9] Velarde emphasizes that his 748 hours of unpaid work in the Salon, Am.

---

[9] Velarde offered conclusory allegations related to his now-abandoned quantum meruit claim, *see* n. 4, *supra,* that he "had a reasonable expectation of receiving payment at an appropriate wage rate for the hours [he] worked for Defendants," Am. Compl. ¶ 69, App'x 21. The only allegation that he made in support of the objective reasonableness of any such expectation, however, was that the Academy "never told [him that] . . . [he] would be forced to work without pay," Am. Compl. ¶ 46, App'x 17. This allegation, however, misses the point: Velarde does not allege that the Academy told him that he *would* be paid for his time in the Salon. We

Compl. ¶ 4, App'x 8, provided an "immediate advantage" to the Academy (in the form of no-cost labor in a for-profit setting), but he does not assert that he replaced paid employees *at the Academy*. Rather, he argues that his lower-cost labor allowed the Academy's Salon to better compete in the marketplace, strengthening the Academy's revenues and not providing commensurate educational benefit to him.

It is undoubtedly true that the Academy—a for-profit institution—derived financial value from Velarde's work in the Salon. That Velarde provided "tangible benefits" to the Academy in this way (and in addition to his tuition payments) is not dispositive of the question before us, however. The sixth *Glatt* factor considers "the extent to which the intern's work complements, rather than displaces, the work of paid employees." *Glatt*, 811 F.3d at 536-37. A student's work is "complementary if it requires some level of oversight or involvement by an employee, who may still bear primary responsibility." *Wang*, 877 F.3d at 75. As Velarde acknowledges in his amended complaint, the Academy advertises that its students provide services "under the watchful eye of [its] industry experienced educators." Am. Compl. ¶ 25, App'x 12. Given the need for such supervision, that Velarde was otherwise "useful or productive" to the Academy did not render him its employee. *Wang*, 877 F.3d at 75 (observing that the *Glatt* factors do not require that "the alleged employer derive no immediate advantage from the activities of the intern"). This is not a case in which a business uses the façade of a vocational school to deceive students into working unexpectedly long hours without compensation, replacing the labor of its paid employees, or working

---

determine objectively whether a purported employee had a reasonable expectation of payment. *See Brown v. N.Y.C. Dep't of Educ.*, 755 F.3d 154, 166 (2d Cir. 2014). Velarde has pointed to no affirmative acts on the part of the Academy that would cause an enrollee to expect payment for services provided in the practical portion of the training program.

hours well beyond long-standing state requirements. Once again evaluating the totality of the circumstances, then, we reiterate our conclusion that Velarde was the primary beneficiary of his relationship with the Academy and therefore was not an employee of the Academy for purposes of FLSA and NYLL.

Our conclusion is consistent with those of other courts to have addressed this issue. The Seventh Circuit recently concluded in a closely parallel setting that "the fact that [cosmetology] students pay not just for the classroom time but also for the practical-training time is fundamentally inconsistent with the notion that during their time on the [salon floor] the students were employees." *Hollins v. Regency Corp.*, 867 F.3d 830, 836 (7th Cir. 2017). Here, as in *Hollins*, Velarde knew that he was paying the Academy not just for eight weeks of classroom instruction, but also for twenty-two weeks of guided practical experience in the Academy's salon, without which he would not have been able to qualify to perform cosmetology services in New York. *See also Benjamin*, 877 F.3d at 1147–48 (cosmetology students not employees of for-profit school that provided state-mandated hours of training for cosmetology licensure).

Similarly, the Sixth Circuit has held that vocational "[s]tudents engage[d] in courses of study that have been considered and approved of by the state accrediting agency" were not employees of the eldercare facility in which they worked. *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 531–32 (6th Cir. 2011). That court noted that the students received genuine benefits, both tangible and intangible. It acknowledged that the students might be "employees" covered by FLSA if the "supervision was inadequate, the exposure to various aspects of the trade limited, and the overall value to the students nil," but determined that none of those descriptors applied. *Id*. In this case, Velarde does not allege that his exposure at the Salon to

cosmetology was limited or that he did not obtain substantial value from his learning experiences at the Academy.

For these reasons, we are persuaded that the District Court correctly granted judgment on the pleadings to the Academy on Velarde's FLSA and NYLL claims.

## CONCLUSION

The primary beneficiary test articulated in *Glatt* applies to the relationship between students who attend vocational schools and those schools. Patrick Velarde was the primary beneficiary of his relationship with the Academy, including with respect to his supervised work in the Salon. Velarde was thus not an "employee" of the Academy under FLSA and NYLL. The judgment of the District Court is **AFFIRMED**.